[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action instituted in September 1995 by the plaintiff wife, Rhonda Lerner, seeking a dissolution of her marriage to the defendant husband, Charles Lerner. The parties were married on August 21, 1982. The wife is 41 years old and the husband is 46 years old. The wife is a high school graduate with one year of college education. The husband has a college degree plus four years of graduate work culminating in a degree as a chiropractor. Both parties are in good health except that the husband requires a hernia operation. There is no evidence indicating that this problem will affect his earning capacity.
The parties have two children, Gavin born March 4, 1984 and Danielle born June 2, 1989. The custody and visitation of the children have been controlled by the parties' October 14, 1996 agreement under which the parties agreed to share equally the physical custody of the children. The trial evidence, however, indicates that the children spend substantially more time with the husband. The parties have resided in the state of Connecticut for more than one year prior to the bringing of this action and the court has jurisdiction over the marriage and the parties. Neither party has received public assistance during the period of the marriage. The marriage has broken down irretrievably and there is no likelihood of reconciliation.
The court makes the following findings:
Soon after the parties married, they moved to Oregon where the husband attended school to acquire his chiropractor's degree which he received in 1986. This graduate study was difficult for him and he failed several courses. He testified that his poor school performance affected the marriage and in his view the breakdown of the parties' relationship may have begun even at this early time in the marriage. Neither party worked while they were in Oregon. They were substantially supported by the husband's father, Arthur Lerner. In fact, Arthur Lerner supported the parties throughout their marriage allowing them to maintain a standard of living above their own earned incomes. Much of his support was in the form of loans, and the outstanding amount of this debt, which the court finds is jointly owed between them, is approximately $318,600. CT Page 4156
After the husband acquired his chiropractor's degree, the parties returned to Connecticut for a short period of time before they moved to California in or about 1987. The husband opened an office and began his chiropractor's practice. The business was not successful and in 1990 the parties moved back to Connecticut. While they were in California, the wife worked for about a year as a receptionist, but she stopped working when Danielle was born in 1989.
When they returned to Connecticut, the parties worked together to restart the husband's chiropractic practice. The wife worked extensively managing the business and maintaining its records, hiring a nanny to assist with the children. The business performed well initially. The income from the business peaked in 1992, but decreased substantially each year thereafter. This decrease was caused by a combination of factors, including competition created by managed health care and the wife's gradual withdrawal and ultimate departure from the business in 1994.
The wife's explanation for the cause of the marital breakdown was somewhat vague and unclear. According to her, the problems started to become serious in 1993. She testified that she lost respect for her husband because she overheard him talking to patients about their marriage; he was constantly relying on advice from his father; and they had different child rearing views. The husband agrees that the wife lost respect for him. This problem appears to be substantially related to the financial support required from the husband's father and the husband's difficulties with his practice and with his ability to provide for the family. In any event, the wife started spending time away from the home and started seeing a Mr. Spear. No evidence was produced establishing that the wife had sexual relations with Spear, but she stopped having intimate relations with her husband and started spending substantial time with Spear. The parties started counseling on three separate occasions in 1994, and according to the husband, all of the counseling sessions ended unsuccessfully because the wife would not stop seeing Spear. Soon after the divorce proceedings were instituted in 1995, the wife stopped seeing Spear, and sometime hereafter, started seeing someone else whom she now continues to date. The husband also started dating someone after the divorce proceedings started. The wife also claims that the husband inappropriately touched her sexually on one occasion, which the husband denies. The court finds no credibility to this claim and places no weight on it. The court finds that the wife grew dissatisfied with the CT Page 4157 marriage, she emotionally and physically withdrew from the marriage, and she ultimately started seeing another man. These actions by her caused the irretrievable breakdown of the parties' marriage.
The parties' primary asset, their marital home at 101 Ridge Road, Madison, Connecticut, is without any equity and is under foreclosure. At the time of the trial, the sale date was scheduled in January 1998, and there was no indication that either party intended to redeem and save this asset. The husband's chiropractic business is the other significant marital asset, but no evidence was produced by either party establishing the fair market value of this asset, and the business has not been generating significant income over the expenses in recent years. The business has approximately between $85,000 and $95,000 in outstanding receivables, but according to the husband, approximately two-thirds of these receivables are uncollectible. The parties have other miscellaneous items of personal property having the values as indicated on their financial affidavits.
The wife presently works in another chiropractor's office performing clerical duties. She earns $320 a week gross and $280 a week net according to her financial statement. She intends to receive training as a court stenographer, but has not completed the training for this work.
According to the husband's financial statement, he presently earns approximately $396 gross from his practice. He testified that his business has recently suffered to such an extent that he has been unable to pay income taxes or make his mortgage payments incurring additional liabilities on these obligations as a result. He lists on his financial statement liabilities totaling $69,595, excluding the approximately $318,600 owed to Arthur Lerner, $233,000 in mortgage liabilities and $5,967 in car loans.
The wife claims that the husband's financial statement understates his earned income. The husband's 1992 income was about $92,000. However, the husband's tax returns show adjusted gross income ranging from $54,075 to $33,295 between the years 1993 and 1996. The most recent tax returns evidence an adjusted gross income of $40,730 in 1995 and $33,295 in 1996. This evidence is consistent with the husband's testimony that his business has declined in recent years and has continued to decline further in 1997. The husband has increased his disposable income in 1997 by not paying liabilities including the mortgage, CT Page 4158 income taxes and real estate taxes.
The wife's primary argument is that the husband's 1992 through 1996 tax returns show tax deductions which should be included in his disposable income. Although at least some of these deductions, such as depreciation, should be attributable to the husband's income; see, Stoner vs Stoner, 163 CONN. 345, 352-353 (1972) (appreciation may be treated as income); the wife's argument is not on point. This is so because these tax returns for prior years do not directly evidence the husband's present earnings. The 1997 tax return was not prepared or offered, and according to the evidence, the husband's earnings have decreased almost every year since 1992. The husband's estimate of his present earnings are based on his recent business records. These business records were available to the wife for review.[1] On balance, the court credits the husband's testimony that his present income from his practice is approximately $400 a week gross; and even considering the wife's claim that the husband actually deposited $25,000 in his personal account during 1997, the court finds that over the past year, the husband's average net income has ranged approximately between $400 and $600 a week. However, the court agrees with the wife that he has a yearly earning capacity of at least between $35,000 and $40,000, which is higher than the wife's earning capacity.
In summary, the evidence indicates that the parties have meager assets as compared to their liabilities. Their marital residence is under foreclosure, with the likelihood that there will be a deficiency in light of the first mortgage and other liens on the property. They have joint tax liabilities exceeding $13,000 for 1994 alone and a joint debt to Arthur Lerner of approximately $318,600. On the basis of their financial statements, their earned weekly income is barely sufficient to meet their weekly living expenses, and therefore, is clearly insufficient to satisfy their total liabilities in the near future.
The court has carefully considered these factual findings and the statutory criteria regarding the granting of a dissolution, the awarding of custody, alimony and child support, and the dividing of assets and liabilities. See Conn. General Statutes § 46b-81, 82, 84. The court issues the following orders:
1. The parties shall have joint legal custody and shared physical custody of their minor children pursuant to the parties CT Page 4159 stipulation of October 14, 1996 and their agreement for the court to make this stipulation part of the court's final order; except that the parties may deviate from the precise terms of the stipulation as they may mutually agree.
2. (A) The court does not award child support to either party. This order is based on the parties' shared custody arrangement, which justifies a deviation from the child support guidelines, and their present incomes. The evidence indicates that despite their agreement to share physical custody equally, the children spend substantially more time with the father than with the mother. The court has rejected the wife's argument that the husband's present earnings are substantially higher than her earnings; but assuming arguendo that the husband's earnings are as the wife alleges, the children's more substantial time with the husband under the parties' actual shared custody arrangement would still warrant the court's child support order. Furthermore, child support is based on consideration of the parties' actual earned income, rather than on their earning capacities, although earning capacity may be a deviation criterion. Unkelbach v.McNary, 244 Conn. 350 (1988). Considering the difficulty which the husband has had regularly maintaining a profitable practice and the parties' substantial liabilities, the court rejects any claim that the child support should be premised on the husband's earning capacity as a deviation criterion.
(B) The husband shall provide medical insurance coverage for the minor children at reasonable costs, and the parties shall share equally any uncovered or un-reimbursed medical, dental or similarly related expenses.
3. The wife shall receive $1 a year in alimony for 8 years, which shall terminate upon the death of either party, the wife's remarriage, or the wife's cohabitation as defined by statute. This alimony shall be modifiable as provided by law. This award is based upon the court's consideration of the applicable statutory criteria, but the court makes particular note of the following: 1) the parties' present income and the husband's ability to pay alimony; the cause for the irretrievable breakdown of the parties' marriage; and the property and liability divisions ordered herein.
4. The husband shall pay to the wife $25,000. This payment represents a property division of the receivables of the chiropractor business operated by the husband. This amount is CT Page 4160 slightly less than 30% of the total receivables estimated as being between $85,000 and $95,000, but this $25,000 also represents most of the collectible amount of these receivables according to the evidence. Unless paid sooner, the husband shall pay $15,000 of this amount within six months from the date of this order; and he shall pay the $10,000 balance within twelve months from the date of this order. In addition to any other remedies available by law, if the husband fails to make these payments, the wife shall have the right to assume and collect any receivables owed to the husband through the chiropractor practice satisfy the amount of any payment not made as ordered, plus the reasonable costs of collection, including reasonable attorney fees, which fees shall not exceed 15% of any amount collected. The wife may secure this $25,000 award by placing a lien on the business' receivables pursuant to Conn. General Statutes §52-355a.
5. Except as provided below, the parties will assume and pay the liabilities listed on their respective financial statements and shall indemnify and hold the other harmless therefrom:
(A) The husband shall assume and pay the Citibank Master Card.
(B) The husband shall assume and pay the debt owed to the husband's father, Arthur Lerner, and shall indemnify and hold the wife harmless therefrom.
(C) the parties shall be jointly liable for and shall share equally any join; tax liabilities owed by them.
6. If the property located at 101 Ridge Road, Madison, Connecticut is not foreclosed then this property shall be sold. The parties shall be jointly liable for and shall share equally any joint, unpaid obligations which are filed as liens on this property and which remain after the sale or foreclosure of this property.
7. The husband shall convey to the wife title to the 1992 Plymouth Voyager Van and the wife shall pay the loan, taxes, insurance and all other expenses regarding this vehicle, and she shall indemnify and hold the husband harmless as to these expenses.
8. Unless otherwise mutually agreed to by the parties, the CT Page 4161 husband shall transfer and deliver to the wife the items of personal property listed in paragraph 8 of the Plaintiff's Amended Proposed Orders, dated November 26, 1997, and all other personal property of the parties shall be the sole and exclusive property of the party in possession of same.
So ordered this 15th day of April 1998
Barry Stevens, Judge